No. 15-2234

# UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

———————————————————

Related Case Nos. 15-2206, 15-2217, 15-2230, 15-2272, 15-2273, 15-2290, 15-2291, 15-2292, 15-2294, 15-2304 and 15-2305

———————————————————

IN RE NATIONAL FOOTBALL LEAGUE PLAYERS CONCUSSION INJURY LITIGATION

Appeal from the United States District Court
For the Eastern District of Pennsylvania
2:14-cv-0029-AB and MDL No. 2323
The Honorable Anita B. Brody

———————————————————

APPELLANT: DARREN RUSSELL CARRINGTON

**REPLY BRIEF OF APPELLANT DARREN RUSSELL CARRINGTON**

Joseph Darrell Palmer, LL.M.
Law Offices of Darrell Palmer PC
2244 Faraday Avenue, Suite 121
Carlsbad, CA 92008
Phone: (858) 215-4064
Fax: (866) 583-8115
darrell.palmer@palmerlegalteam.com
Attorney for Appellant Darren Russell
Carrington

## TABLE OF CONTENTS

I.    INTRODUCTION ……………………………………………… 1
      A. The Settlement Does Not Compensate CTE ……………………… 1
      B. The Failure To Compensate The Mood Disorders
         Associated With Traumatic Injury Is A Glaring Omission,
         Particularly In Light Of The Facts Giving Rise To
         This Litigation ……………………………………………… 3
      C. The Settlement Fails To Address A Broad Range Of
         Neurological Disorders And Social Effects Of Brain Injury ……  6
      D. The NFL Brief In Particular Seeks To Confuse The Court
         As To The Findings As To The Causal Connection Between
         Repetitive Brain Trauma And Brain Injury ……………………… 7
      E. The Benefits Of The Settlement Are Unfairly Reduced
         For Stroke, Which Can Be A Consequence Of The Very
         Brain Injuries At Issue In The Litigation ………………………  8
      F. Failure to Resolve Lien Issues Renders the Settlement
         Unfair; Approval of the Settlement without Sufficient
         Information to Assess the Value to the Class was an
         Abuse of Discretion ……………………………………… 9

II.   CONCLUSION ………………………………………………  10

CERTIFICATES OF COMPLIANCE …………………………………  11

CERTIFICATE OF BAR MEMBERSHIP ………………………………  11

## **TABLE OF AUTHORITIES**

### **Codes, Rules and Other Materials**

*Consensus Statement on Concussion in Sport: The 4th International*
*Conference on Concussion in Sport Held in Zurich, November 2012*
Paul McCrory, et al., 47 Brit. J. Sports Med. 250, 257 (2013) ……………. 8

*Patients With Traumatic Brain Injury Population-Based Study*
*Suggests Increased Risk of Stroke*
Yi-Hua Chen, et al., Stroke 2011**;** 42: 2733**-**2739 …………………………. 9

*Prevalence and Characterization of Mild Cognitive Impairment in Retired*
*National Football League Players*, 19 J. Int'l Neuropsychological Soc'y.,
Christopher Randolph, Stella Karantzoulis & Kevin Guskiewicz,
873, 877 (2013) ………………………………………………………. 7

# I.    INTRODUCTION

The Opening Briefs of both the National Football League and NFL Properties LLC and Plaintiffs reflect the fact that the stakes in this litigation are extremely high.  As evidence mounted as to the serious effects of repetitive brain injury, the NFL agreed to this settlement to limits its liability, and Plaintiffs' counsel suffer from a serious conflict of interest because of the substantial fee award at state.  But the settlement is not fair to class members.  The evidence presented by both plaintiffs and defendants attempts to obscure fundamental truths about the status of research into traumatic brain injury.  The district court abused its discretion in approving this settlement based on erroneous factual conclusions.  Moreover fundamental aspects related to the functioning of the settlement going forward were not clarified as part of the settlement process, rendering the settlement impermissibly vague.  The court of appeal should reverse approval of the settlement.

## A. The Settlement Does Not Compensate CTE

It is undisputed fact:  The settlement provides no compensation for CTE for any players who were alive on the day the settlement was granted final approval.

Both the NFL Respondents and the Plaintiffs insist, however, that the settlement does compensate retired players suffering from CTE.  In part, they argue that players suffering from brain trauma will be adequately covered by the settlement, because it compensates *symptoms*, even if it does not compensate CTE.  The NFL Players Opening Brief, for example, states that "the Settlement ***does*** compensate the cognitive symptoms allegedly associated with CTE."  (emphasis added).  NFL Opening Brief, page 29, citing A.136.  The NFL argues the appellants simply read the studies wrong:

1

> "The studies relied on by Objectors indicate that the majority of Retired Players" diagnosed with CTE after death—the only time CTE can be diagnosed—"would have received compensation under the Settlement if they were still alive" based on the settlement's benefits for the neurocognitive and neuromuscular impairments covered by the qualifying diagnoses of Neurocognitive Impairment Levels 1.5 and 2, dementia, Alzheimer's, Parkinson's, and ALS." NFL Brief, page 29. They also agree with the District Court that "it is reasonable not to compensate the mood and behavioral conditions anecdotally associated with CTE" because "limiting compensation to objectively measurable symptoms of cognitive and neuromuscular impairment is a key principle of the Settlement."

*Id.* Plaintiffs' arguments are similar. They also claim that even though CTE is not covered, players suffering from CTE will be compensated because of the symptoms. They assert: "Significantly, the fact that CTE itself is not covered (apart from players who died before final approval) does not mean that players with cognitive conditions purportedly associated with prospective CTE are left without a remedy. To the contrary, the district court specifically found as follows: "Assuming arguendo that Objectors accurately describe the symptoms of CTE, the existing Qualifying Diagnoses compensate the neurocognitive symptoms of the disease. Levels 1.5 and 2 Neurocognitive Impairment compensate all objectively measurable neurocognitive decline, regardless of underlying pathology." Plaintiffs Opening Brief at 79, citing A141. These arguments seek to obscure the truth, which is that a broad range of neurological symptoms that retired players are currently suffering from are not compensated under the terms of the settlement. The most glaring defect is the omission --or indeed the preclusion – of any recovery for CTE among currently living players, but the settlement also ignores a far more broad array of effects and injuries and will leave many players with very limited remedies.

/ / /

/ / /

**B. The Failure To Compensate The Mood Disorders Associated With Traumatic Injury Is A Glaring Omission, Particularly In Light Of The Facts Giving Rise To This Litigation.**

As the NFL pointed out, "The District Court also concluded that "it is reasonable not to compensate the mood and behavioral conditions anecdotally associated with CTE" because "limiting compensation to objectively measurable symptoms of cognitive and neuromuscular impairment is a key principle of the Settlement." NFL Brief, at 29.   The NFL Players agree with the court that "[m]ood and behavioral symptoms are commonly found in the general population and have multifactorial causation" and that "Retired Players tend to have many other risk factors for mood and behavioral symptoms."  Id. citing A.143.

To respond to these arguments it is appropriate to consider the role mood disorders played in increasing our understanding of the effects of traumatic brain injury.  One way to look at those issues is to consider how the deaths of certain players led to increased awareness of and research into traumatic brain injury, and CTE.

- 2002. Mike Webster, former center for the Pittsburgh Steelers and Kansas City Chiefs, dies.  Before his death Webster suffered from a broad range of mood disorders and depression, and for several years he lived out of his pickup truck or in train stations between Wisconsin and Pittsburgh.  Allegheny County medical examiner Dr. Bennet Omalu performed an autopsy on Webster's brain after his death, eventually discovering the first evidence of a brain disease that had never been previously identified in football players, Chronic Traumatic Encephalopathy, or CTE.

- 2004:  After complaining of depression and behaving erratically, former Pittsburgh Steeler Justin Strzelczyk drives his car at 90 mph into a tractor-trailer. Just 36, he had been exhibiting erratic behavior for months. Omalu examines his brain and finds evidence of CTE.

- 2005.  Terry Long, former Pittsburgh Steelers lineman, committed suicide by drinking antifreeze.  Doctors who studied his brain found that brain damage from his football career

contributed to his depression and later suicide. Dr. Omalu later examines his brain, and finds CTE.

- 2006. Andre Waters, a defensive back who spent most of his 12 seasons in the NFL with the Philadelphia Eagles, died as a result of a self-inflicted gunshot wound at the age of 44. He had been working as a college football coach prior to his suicide. Dr. Omalu later examines his brain and finds CTE.

- 2009: Chris Henry dies after either falling or jumping from a moving truck. His mother says he had been having headaches and mood swings. He is later diagnosed with CTE.

- 2011. Former Chicago Bears defensive back Dave Duerson, 50, committed suicide with a gunshot to the chest, rather than his head, so his brain could be researched for CTE. Boston University researchers found CTE in his brain.

- 2012: Junior Seau shoots himself in the chest. The National Institutes of Health determines that he suffered from CTE.

- 2012. Former Atlanta Falcons safety Ray Easterling, 62, committed suicide. An autopsy found signs of CTE.

- 2012. Jovan Belcher of the Kansas City Chiefs killed his girlfriend before taking his own life. Researchers determined his brain showed signs of CTE.

- 2013. Paul Oliver, former San Diego Charger, was found dead from a self-inflicted gunshot wound at age 29. The lawsuit later filed against the NFL alleged that his death was a "direct result of the injuries, depression and emotional suffering caused by repetitive head trauma and concussions suffered as a result of playing football, not properly appreciating football's risks with respect to head trauma". The suit claims that Oliver suffered "mood, memory and anger issues" associated with repetitive head trauma and that after his death, a pathologist confirmed he had chronic traumatic encephalopathy.

For the most part these suicides occurred in men who had not been diagnosed with dementia, Alzheimer's, ALS or Parkinson's (with Mike Webster as one notable exception). With the exception of Webster, it is likely none of these athletes – whose lives were clearly destroyed by the neurological damage caused

4

during their football careers – would recover from the settlement if they were alive and suffering from the symptoms that led to their deaths.  Nor would their families have any right to recovery if they had died just a few days after the court's final approval of the class action settlement.  Due consideration of their deaths must lead the court to reject the district court's determination that failure to compensate mood disorders was fair or reasonable.

The court's determination that ""[m]ood and behavioral symptoms are commonly found in the general population and have multifactorial causation" ignores the overwhelming evidence that former NFL players who suffer from the effects of repeated head trauma suffer from mood disorders to a degree wholly unrelated to the population at large.  The district court's decision to ignore the evidence on this fact was an abuse of discretion.

More generally, the key error with this settlement is that it minimizes the broad range of complicated and interrelated traumatic brain injury disorders.  The Amicus Brief filed by the Brain Injury Association described the range of symptoms and complications as lying along a continuum from altered cells to medical problems to outright disability.  Their Amicus Brief pointed out that symptoms of traumatic brain injury can vary tremendously, but stressed that many of the symptoms and conditions are omitted entirely from the settlement as approved by the District Court.  Amicus Brief of BIAA at page 12.  In addition, the National Institute of Health's (NIH) Consensus Statement, Rehabilitation of Persons with Traumatic Brain Injury, identified behavioral deficits and mood disorders as consequences of TBI, even leaving aside the issue of CTE.  As Amicus summarized, "inexplicably this settlement overlooks and excludes players with these impairments."  Amicus Brief at page 22.  Approving such a settlement was an abuse of discretion.

/ / /

**C. The Settlement Fails To Address A Broad Range Of Neurological Disorders And Social Effects Of Brain Injury.**

Although we believe the key substantive defect in the settlement is its failure to provide compensation for CTE, leaving aside the CTE issue, the settlement utterly fails to address the complex range of consequences of the repetitive brain trauma former players are at risk of developing.  The Amicus Brief filed by the Brain Injury Association makes clear that the settlement fails on multiple levels to properly address the consequences of brain trauma, regardless of whether that trauma is diagnosed as CTE.  Amicus summarized the flaws in the court's analysis as follows:

> The settlement neither recognizes nor compensates the majority of players suffering long-term consequences of brain trauma, but merely rewards certain, small, discrete groups. The vast majority of retired football players experiencing physical, emotional, and behavioral impairments following repetitive concussions remain excluded and uncompensated under settlement terms.  In the interest of expediency, the District Court relied on self-serving submissions of counsel, which unjustifiably categorized the vast majority of brain injuries as not being "serious" or unrelated to repetitive head trauma, ignoring the overwhelming scientific consensus regarding the causes and ramifications of traumatic brain injury. (citing J.A.142)

> Although the settlement purports to provide generous financial stability for players with traumatic brain injury, analysis reveals a systematic design to exclude most from participation and reduce payments to the small group who meet arbitrary criteria. It imposes unfair and illogical restrictions on the categories of compensable injuries.

Brief Amicus Curiae of Brain Injury Association of America in Support of Appellants Seeking Reversal, pages 12-13.

A related problem with the settlement is that it fails to meaningfully address the multiple life issues raised by traumatic brain injury.  The BIAA has pointed out that a settlement designed to compensate players who sustained traumatic brain injury should provide appropriate treatment options.  Under this settlement, the

treatment options are limited to medical treatment, pharmaceuticals and counseling. But the conditions giving rise to this litigation require a multifaceted approach. Besides medical care, class members suffering from neurological damage will require a wide range of home and community-based services. For many of the more severely injured class members, the additional services required will include extended periods of assisted living or nursing home care. The settlement does little to address these issues, meaning individual recoveries may well be spent covering these kinds of services, which ideally should have been part of the complement of services addressed by this settlement.

### D. The NFL Brief In Particular Seeks To Confuse The Court As To The Findings As To The Causal Connection Between Repetitive Brain Trauma And Brain Injury.

Just as for decades tobacco companies sought to convince the public that there was no causal connection between cigarette smoking and lung cancer, the NFL is continuing to assert there is no causal connection between repetitive brain trauma and conditions like CTE. The NFL argues:

> Although science has identified an association between brain trauma and the qualifying diagnoses other than "Death with CTE," it has not determined that association "to be a *causal* one." A.3476 (Yaffe Decl. ¶14). In particular, study of the long-term neurocognitive effects of concussion and mild traumatic brain injuries is relatively undeveloped. A.3483-84 (Yaffe Decl. ¶43); *see also* A.3146 (Christopher Randolph, Stella Karantzoulis & Kevin Guskiewicz, *Prevalence and Characterization of Mild Cognitive Impairment in Retired National Football League Players*, 19 J. Int'l Neuropsychological Soc'y., 873, 877 (2013)) (noting the lack of any studies linking repetitive head trauma in professional football to long-term neurocognitive deficits). Epidemiological studies thus generally have not established a causal connection between concussions and mild traumatic brain injuries and the long-term neurocognitive deficits alleged in this case. The link is particularly weak with regard to CTE, where leading scientists agree that "CTE [is] not related to concussions alone or simply exposure to contact sports. At present,

there are no published epidemiological, cohort or prospective studies relating to modern CTE.… As such, the speculation that repeated concussion or subconcussive impacts cause CTE remains unproven." A.3158 (Paul McCrory, et al., *Consensus Statement on Concussion in Sport: The 4th International Conference on Concussion in Sport Held in Zurich, November 2012*, 47 Brit. J. Sports Med. 250, 257 (2013)); *see also* A.3422 (Schneider Decl. ¶27) ("Because of the limited number of studies available, and the nature of the case reports that have been published, it is my opinion that we do not know enough about CTE to adequately understand its risk factors, the relation between repetitive TBI and CTE, or the diagnostic and clinical profile of CTE.").

The court should be suspicious of efforts to conceal what we do know about traumatic brain injury: Make no mistake, the NFL is continuing to assert the arguments made in an effort to stonewall individual litigants leading up to this settlement. Their arguments are contrary to scientific findings and common sense, and the court should not be swayed by them.

### E. The Benefits Of The Settlement Are Unfairly Reduced For Stroke, Which Can Be A Consequence Of The Very Brain Injuries At Issue In The Litigation.

The settlement unfairly reduces benefits by 75 percent if a player sustains a stroke post-concussion. A. 1395-1396. This offset is particularly troubling because individuals who have sustained traumatic brain injury confront a markedly increased risk of stroke. The Amicus Brief of the Brain Injury Association cited a study published in *Stroke: Journal of the American Heart Association*, which found that patients experiencing a traumatic brain injury were at nearly a ten times greater risk of suffering a stroke in the three month period following their traumatic brain injury than a control group. More troubling still, individuals who had experienced a traumatic brain injury remained at significantly higher risk throughout the period of the study. After one year, that risk had fallen to only 4.6 times higher than the control population. And after five years, traumatic brain injury sufferers were 2.3 times more likely to sustain a stroke. Amicus Brief of

BIAA at page 19, citing Yi-Hua Chen, et al., *Patients With Traumatic Brain Injury Population-Based Study Suggests Increased Risk of Stroke*, Stroke 2011**;** 42: 2733-2739.  Brain trauma is a significant risk factor for stroke.  Rather than limiting recovery, stroke should be considered an additional injury, and should be compensated under the settlement, rather than being viewed as grounds to deny the benefits of the settlement to a former player.

With this settlement the devil is in the details – what seems to be a minor caveat could significantly limit settlement benefits for many class members.

### F.   Failure to Resolve Lien Issues Renders the Settlement Unfair; Approval of the Settlement without Sufficient Information to Assess the Value to the Class was an Abuse of Discretion.

Neither Plaintiff Appellees nor the NFL Defendants addressed this appellants' arguments that the failure to resolve Medicare and Medicaid Lien issues was a key omission leaving the benefit of the settlement unclear.  The NFL did, however, claim that under the NFL Collective Bargaining Agreement players would still be able to claim benefits provided by the NFL Former Player Life Improvement Plan.  They claim that those benefits provide for, among other things, coordination of comprehensive neurological care and evaluation at top tier medical facilities, a Medicare benefit (of $120 per month toward supplemental Medicare insurance), a discount prescription drug benefit, and an assisted living benefit.  NFL Brief, page 34, citing A.3360-64.  The so-called assisting living benefit, as described in the Collective Bargaining Agreement is, unfortunately as vague and imprecise as are the benefits under this settlement.  Article 64, Section 1, (c)(iii) of the NFL's 2011-2020 Collective Bargaining Agreement describes the "Former Player Life Improvement Plan.", including the assisted living benefits.  That section reads as follows (in full).  ""Assisted Living Benefits. All eligible former players will be entitled to certain discounts and preferred access at participating assisted living providers." Page 246, NFL Collective Bargaining Agreement (2011-

2020, NFL Players Association).  Available at http:
nflcommunications.com/current-cba/.  "Certain discounts and preferred access" –
already available under the collective bargaining agreement – hardly address the
substantial uncertainty created by the parties' failure to attempt to settle issues
related to Medicare and Medical liens prior to submitting the settlement to the
district court for approval.  This is a further substantial reason for reversing
approval of the Settlement and requiring the parties to complete negotiations on
this issue prior to submitting a revised settlement to the court for final approval.

## II.     CONCLUSION

The district court's approval of a settlement that purports to compensate
injured former NFL players, while leaving large categories of injuries
uncompensated, was an abuse of discretion.  The lawsuits filed against the NFL
were aimed at addressing the serious and multiple problems caused by the brain
injuries former football players experienced on the field.  In the last few years
players have learned that their pro football careers significantly increased their risk
for a broad range of neurological disorders, including in particular CTE.  The
court's ruling essentially sides with the NFL, which for decades has aggressively
attempted to minimize the connection between concussion and neurological
damage.  This court should reverse approval of this wholly unsatisfactory
settlement.

Dated: September 30, 2015             Law Offices of Darrell Palmer PC

                                      /s/ Joseph Darrell Palmer_____
                                      Joseph Darrell Palmer
                                      Attorney for Appellant Darren R. Carrington

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that the attached brief was produced in Times New Roman (a proportionately-spaced typeface), has a typeface of 14 points and contains 3,064 words.

## CERTIFICATE OF IDENTITY BETWEEN ELECTRONIC AND PAPER COPIES

I certify that, pursuant to Third Circuit Local Rule 31.1(c), that the text of the electronic brief filed with the Court is identical to the text in the paper copies.

## CERTIFICATE OF VIRUS SCAN

I certify, pursuant to Third Circuit Local Rule 31.1(c), that a virus detection program has been run on this file and that no virus was detected. The virus detection program utilized was Microsoft Intune Endpoint Protection, version 4.8.204.0.

## CERTIFICAT OF BAR MEMBERSHIP

I certify, pursuant to Third Circuit Local Rule 28.3(d), that I was admitted to the Bar of the United States Court of Appeals for the Third Circuit on February 4, 2010, and remain a member in good standing of the Bar of this Court.

Dated: September 30, 2015                    By: /s/ Joseph Darrell Palmer_____
                                                         Joseph Darrell Palmer

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 30, 2015, I electronically filed the

foregoing with the Clerk of the Court for the United States Court of Appeals for

the Third Circuit by using the appellate CM/ECF system.

I further certify that all parties in this case who are registered CM/ECF users

that service will be accomplished by the appellate CM/ECF system.


_/s/ Joseph Darrell Palmer_____
Joseph Darrell Palmer